**Dr. Alfred BENNUN, Plaintiff,**

v.

**RUTGERS, THE STATE UNIVERSITY, Defendant.**

Civ. A. No. 84–4655.

United States District Court,
D. New Jersey.

May 21, 1990.

As Amended May 23, 1990.

Michael H. Sussman, Goshen, N.Y., for plaintiff.

Irving L. Hurwitz, James P. Lidon, Carpenter, Bennett & Morrissey, Newark, N.J., for defendant.

## OPINION AND ORDER

POLITAN, District Judge.

Plaintiff, Dr. Alfred Bennun, is an associate professor of Biochemistry at Rutgers, The State University. He instituted this action on November 13, 1984 alleging that the University failed to promote him to the rank of full professor in 1981, 1982, and 1985 because of discrimination on the basis of his national origin and in retaliation for prior litigation against the University. Specifically, Bennun charges violations of Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et seq.*, and the Civil Rights Act of 1870, 42 U.S.C. § 1981. The following constitutes my findings of fact and conclusions of law.[1]

Plaintiff is Hispanic, born and educated in Argentina. He earned his PhD in Biochemistry at the University of Cordoba in 1963. He completed post-doctoral research at the University of Buenos Aires, Duke University, the Weitzman Institute, Cornell University and the Public Health Institute in New York. He joined Rutgers' Department of Physiology and Zoology in August 1969 as an Associate Professor without tenure. In November 1970 Bennun's department unanimously recommended that he be given tenure. A variety of controversies thereafter arose and Bennun was not promoted but was rather given a "terminal" contract for one year. In 1972 Bennun initiated litigation against Rutgers and several professors alleging that they had maliciously interfered with his right to contract. In June 1972 Bennun was given tenure.

Between 1975 and 1978 Bennun either initiated or participated in numerous EEOC and civil actions against the University charging it with a variety of discriminatory practices against Bennun and other Hispanics. In particular, Bennun complained that he was consistently given inadequate office space in retaliation for his actions against Rutgers. In 1978 Associate Dean Rafael Caprio was assigned to investigate the substance of Bennun's office space complaints. Caprio found that Bennun had been provided with office and research space significantly less than other members of his department in his discipline.

In 1979, 1981, 1982 and 1985 Bennun sought promotion to full professor and was denied. In 1981 Bennun filed a grievance alleging that the 1980–1981 evaluation was arbitrary and capricious, based on personal prejudice and discrimination. The Grievance Committee recommended that Bennun be evaluated by an outside arbitrator. Bennun thereafter instituted a civil action in New Jersey Chancery Division. Judge David Landau found that the Grievance Committee lacked authority to make such a recommendation and ordered that a remanded evaluation be conducted. The remanded evaluation occurred in 1984–1985.

Rutgers' promotion procedures are set forth in University Regulations issued by the Board of Governors.[2] Promotion and evaluation procedures are established annually by the Executive Vice President and academic officer. A promotion candidate's "promotion packet" consists of a statement of the candidate's qualifications set forth on a form, outside confidential letters of evaluation and evaluation forms added at each succeeding level of evaluation. The candidate's promotion packet is first evaluated by the tenured faculty in his or her department who are at or above the rank for which the candidate is being considered.

---

1. Also before the Court is Bennun's claim that he was denied equal teaching and committee assignments. At the close of Plaintiff's case, defendant moved to dismiss these claims. Plaintiff did not object, arguing that Bennun did not assert these allegations as independent causes of action but rather used them to show the circumstances under which Bennun was forced to work. The court finds, therefore, that plaintiff waived these claims as independent causes of action and does not address them as such.

2. The parties stipulated to the following discussion of Rutgers promotion procedure.

Starting in academic year 1983–1984, there was a separate evaluation by the department chair.

Separate copies of the promotion packet, containing the statement of qualifications, outside letters and department and chair evaluations, go to the academic unit's Appointment and Promotion Committee ("A & P") and the appropriate section. The Appointment and Promotions Committee consists of four faculty members, two of whom are elected by the faculty and two of whom are appointed by the Dean. The Committee is advisory to the Dean. It evaluates the candidate on the basis of the promotion packet.

The section is a University-wide group of all faculty members in a discipline. Prior to March 1989, the section evaluated candidates for promotion. The promotion packet reviewed by the section contains the statement of qualifications, the department evaluation and the outside letters. It does not contain the A & P Committee or the Dean evaluations. The section's evaluation is limited to research and scholarly activity.

The Dean conducts a separate evaluation. The promotion packet he reviews contains the statement of qualifications, department and A & P evaluations and the outside letters. The Dean does not have the Section evaluation.

The function of the Promotion Review Committee ("PRC") is to advise the President on promotions within the tenured ranks. Its membership consists of the three campus provosts and four senior faculty members who are appointed by the President. The PRC Committee is chaired by the Executive Vice President and Chief Academic Officer who serves without vote. The PRC reviews the full promotion packet, including all previous evaluations, and makes a recommendation to the President.

The promotion procedure for any particular year and the role of each valuative body is set forth annually by the Executive Vice President and Chief Academic Officer in Academic Reappointment/Promotion Instructions. These instructions contain the promotion schedule, the forms to be used in the process, and explanation of the responsibilities of the candidate and each valuative body, information regarding outside letters and information concerning the materials and standards to be used in the promotion process.

[1] The first issue before the Court concerns whether plaintiff has stated a cognizable claim for relief under § 1981.[3] In *Patterson v. Mclean Credit Union*, 491 U.S. ——, 109 S.Ct. 2363, 105 L.Ed.2d 132 (1989), the Supreme Court dramatically limited the scope of § 1981 holding it inapplicable to a vast array of post contract discriminatory practices. Nevertheless, the Court left open the possibility that certain discriminatory promotion claims would still be actionable under § 1981. The Court wrote:

> The question whether a promotion claim is actionable under § 1981 depends upon whether the nature of the change in position was such that it involved the opportunity to enter into a new contract with the employer. If so, then the employer's refusal to enter the new contract is actionable under § 1981.... Only where the promotion rises to the level of an opportunity for a new and distinct relation between the employee and the employer is such a claim actionable under § 1981. *Cf. Hishon v. King & Spalding*, 467 U.S. 69 [104 S.Ct. 2229, 81 L.Ed.2d 59] (1984) (refusal of law firm to accept associate into partnership).

The dispositive inquiry is, therefore, whether promotion from associate professor to full professor would have created a new and distinct contractual relation between Bennun and Rutgers. The Court finds that it would have for a variety of reasons.

**3.** This section provides: "All persons within the jurisdiction of the United States shall have the same right in every State and Territory to make and enforce contracts, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property as is enjoyed by white citizens, and shall be subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other."

First, there are significant and substantial differences between the associate and full professor in terms of prestige and perception. Within the academic community the unqualified title of professor is one of the ultimate goals of the academician. The professor may at times publish in the same journals and perhaps teach the same courses as an associate professor but, like the partner in a law firm, the full professor is regarded with a greater degree of respect and deference than is the associate professor. His academic opinion and judgment is simply accorded more weight than the associate. This difference is also manifest in the lay community where the title professor, like the title "Doctor" or "Counselor", is one of reverence and respect. It is a title far more significant than associate professor or associate lawyer. Differences in terms of perception and prestige are directly relevant to a § 1981 inquiry.

There are also significant differences in terms of function between the associate and full professor. The professor participates to a greater extent in University governance and can, if so qualified, advance on the ladder of academic achievement. At Rutgers, the professor can serve on the PRC, the A & P committee and can also review associate professors within the individuals own department for promotion. The full professor is, therefore, a full partner and participant in University governance. The associate professor is, as the title suggests, a junior participant in all aspects of University life. He cannot participate in the higher review committees which, as is amply manifest in this litigation, exercise great power over the future of the University. These differences clearly indicate that the professor has a new and distinct contractual relation with his employer. Like the associate elevated to the status of partner, the professor becomes a participant in the management of the organization.

Two other points illustrate the significant contractual differences between the two positions. First, Rutgers has created an elaborate promotion procedure which is designed to insure that only the most qualified individuals are elevated to exalted rank of professor. The Court recognizes that the process created to separate two positions should not be the determinative factor in the § 1981 analysis. Yet the process surely bespeaks something of the difference and the value placed by the university on the position this process is created to serve. The testimony establishes that the process did not exist, in a vacuum, to serve itself. Rather, it indicates that the process was so elaborate because the University placed such significance on the title and promotion. University Policy simply states that "A full professorship is the highest academic rank."

It is also true that an individual who is perennially rejected for promotion to full professor exists in a strange limbo where, like the permanent law associate, he may have a degree of monetary satisfaction but is never professionally fulfilled. Both individuals are hampered by the same stigma. One never made "partner" and the other never made "professor". This stigma hampers each individual professionally and personally. Both individuals will never have the personal satisfaction of knowing what goes on behind the closed doors of the partners and professor meetings. It may be true that nothing at all of interest to them or the world at large goes on behind those doors. But what is important is that the individuals behind the doors zealously guard the portals and create elaborate procedures to maintain the appearance, if not the reality, of the significance of the advancement and world beyond the threshold. The Court cannot ignore the significance of this fact and therefore finds that there are objective and intangible differences between an associate professor and full professor such that promotion would constitute a new and distinct contractual relation between the employer and employee within the ambit of § 1981.

■ To prevail on a claim of disparate treatment under Title VII or § 1981 a plaintiff must demonstrate purposeful discrimination. *See Patterson v. Mclean Credit Union*, 491 U.S. ——, ——, 109 S.Ct. 2363, 2377, 105 L.Ed.2d 132 (1989). To facilitate the often difficult task of prov-

ing discrimination by direct evidence, the Supreme Court has established a framework of shifting burdens of proof. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Texas Department of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981); *Trans World Airlines, Inc. v. Thurston,* 469 U.S. 111, 121, 105 S.Ct. 613, 621–22, 83 L.Ed.2d 523 (1985). Under this framework, the plaintiff has the initial burden of proving a *prima facie* case by a preponderance of the evidence, which, if successful, raises the inference of unlawful discrimination. *Burdine,* 450 U.S. at 250–252, 101 S.Ct. at 1092–1093.

■■■ The burden of establishing a *prima facie* case is not difficult.[4] The plaintiff must show that he is a member of a racial minority, qualified for the job from which he was discharged, and that others not in the protected class were treated more favorably. *See Hankins v. Temple University,* 829 F.2d 437, 440 (3d Cir.1987). After establishing a *prima facie* case the burden of production shifts to the defendant to clearly set forth the legitimate, nondiscriminatory reason for the discharge. *Burdine,* 450 U.S. at 255, 101 S.Ct. at 1094–95. If the defendant meets this burden the inference of discrimination created by the *prima facie* case is eliminated and the burden shifts back to the plaintiff who must prove by a preponderance of the evidence that the reasons asserted by the defendant were a pretext for discrimination. *Id.* at 253, 101 S.Ct. at 1093–94. The plaintiff may meet this burden either directly, by showing that a discriminatory reason more likely motivated the employer, or indirectly, by showing that the asserted reason is unworthy of credence. *Id.* at 256, 101 S.Ct. at 1095.

Plaintiff bears the ultimate burden of proof and he must therefore establish that "his status as a minority class was the but

for reason for the treatment accorded." *Bellissimo v. Westinghouse Elec. Corp.* 764 F.2d 175, 179 (3d Cir.1985), *cert. denied,* 475 U.S. 1035, 106 S.Ct. 1244, 89 L.Ed.2d 353 (1986) (*citing Lewis v. University of Pittsburgh,* 725 F.2d 910, 921 (3d Cir.1983), *cert. denied,* 469 U.S. 892, 105 S.Ct. 266, 83 L.Ed.2d 202 (1984); *Dillon v. Coles,* 746 F.2d 998 (3d Cir.1984)). *See Price Waterhouse v. Hopkins,* — U.S. —, 109 S.Ct. 1775, 104 L.Ed.2d 268 (1989) ("The critical inquiry ... is whether gender was a factor in the employment decision at the moment it was made.") (Brennan, Plurality Opinion, "... our specific references to gender throughout this Opinion, and the principles we announce, apply with equal force to discrimination based on race, religion, or national origin."). This test does not require the plaintiff to establish "that the discriminatory reason was *the* determinative factor, but only that it was *a* determinative factor." *Id.* (*citing Smithers v. Bailar,* 629 F.2d 892, 898 (3d Cir.1980)). It recognizes that "more than one 'but for' cause can contribute to an employment decision, and if any one of those determinative factors is discriminatory, Title VII has been violated." *Id.* (*citing Lewis,* 725 F.2d at 917 n. 8.)

■■■ The requirements of a discriminatory retaliation claim are similar to a disparate treatment case. The plaintiff must first establish a *prima facie* case before the burden of production shifts to the Defendant. *Burrus v. United Telephone Co. of Kansas, Inc.,* 683 F.2d 339, 343 (10th Cir.1982), *cert. denied,* 459 U.S. 1071, 103 S.Ct. 491, 74 L.Ed.2d 633 (1982). To establish a *prima facie* case of retaliation the plaintiff must demonstrate: (1) that he/she engaged in statutorily protected activity; (2) that he suffered an adverse employment action; and (3) that a causal links exists between the protected activity and the discharge. *Jalil v. Advel Corp.,* 873 F.2d 701,

---

**4.** *See Roebuck v. Drexel University,* 852 F.2d 715, 726 (3d Cir.1988). In the context of a failure to grant tenure the court wrote that the plaintiff "need only show that he was sufficiently qualified to be among those persons from whom a selection, to some extent discretionary, would be made. That is, he need show only that his qualifications were at least sufficient to place him in the middle group of tenure candidates as to whom both a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion by the tenure-decision making body."

708 (3d Cir.1989), *cert. denied,* —— U.S. ——, 110 S.Ct. 725, 107 L.Ed.2d 745 (1990) (*citing Jordan v. Clark,* 847 F.2d 1368, 1376 (9th Cir.1988), *cert. denied sub nom, Jordan v. Hodel,* 488 U.S. 1006, 109 S.Ct. 786, 102 L.Ed.2d 778 (1989)). The causal "connection may be demonstrated by evidence of circumstances that justify an inference of retaliatory motive, such as protected conduct closely followed by adverse action." *Burrus,* 683 F.2d at 343.

■ Plaintiff concedes that there is no direct, smoking gun evidence indicating that Bennun was denied promotion because of his Hispanic origin. Rather, plaintiff relies on a comparative analysis of Dr. Bennun and various other individuals promoted during the relevant time period. Rutgers rigorously argues that comparative analysis can only be used when there is only one distinguishing feature between the plaintiff and the comparative group (*i.e.,* national origin). This position is unpersuasive for a variety of reasons.

First, the Third Circuit has consistently endorsed the use of such comparisons in a disparate treatment case. *See E.E.O.C. v. Franklin & Marshall College,* 775 F.2d 110, 116 (3d Cir.1985) (citing, *Namenwirth v. Board of Regents of University of Wisconsin System,* 769 F.2d 1235, 1240 (7th Cir.1985), *cert. denied,* 474 U.S. 1061, 106 S.Ct. 807, 88 L.Ed.2d 782 (1986)); *Kunda v. Muhlenberg College,* 621 F.2d 532, 538 (3d Cir.1980) ("... consideration of the practices of the college toward the plaintiff must be evaluated in light of its practices toward the allegedly more favored group...."). Moreover, defendant's argument is logically flawed in that it would be the rare to non-existent case where there would be *only one* difference between the plaintiff and the comparative group. The Court readily accepts the argument that for the comparison to be meaningful the individuals must be similarly situated. This principle cannot, however, be extended to the absurd length urged by defendant. Universities are not beyond the purview of Title VII. As such, comparative analysis must be used to determine if the admittedly subjective and "arcane" determinations governing promotion were not used as a "mechanism to obscure discrimination...." *Kunda,* 621 F.2d at 548; *see, Namenwirth,* 769 F.2d at 1240 ("To prove the proffered motive is not worthy of belief, evidence of a comparative sort is appropriate: if others were hired or promoted though by the same reasoning they ought to have been excluded, then the motive is 'pretext.'"). That is, the comparison must be used to determine if the promotion criteria were applied uniformly.

Finally, Rutgers' promotion policy implicitly, if not explicitly, endorses the use of comparative analysis in the promotion process. The policy provides that "By this process, it is hoped that all significant information with respect to the services and accomplishments faculty members are rendering within their department, within their college, within their scholarly field, and within the University will be brought out and compared with the services and accomplishments of other colleagues having the same or similar duties." This language suggests that comparative analysis is similarly appropriate in a Title VII case.

■ The Court will first analyze the issue of plaintiff's *prima facie* case of retaliation. Plaintiff has clearly met the initial burden of proof by demonstrating that he engaged in various statutorily protected activities designed to vindicate perceived civil rights violations. Bennun was also subject to adverse employment action. He was not promoted. The more difficult issue concerns the causal link between the two events.

■ Plaintiff urges the Court to infer retaliatory animus on the basis of two pieces of evidence. First, Bennun's testimony that prior to an EEOC meeting a University representative, Alice Evangelidis, told Bennun that "he should never have been granted tenure in the first place." Bennun also relies on the 1984 EEOC finding that "there is reasonable cause to believe" that Bennun was retaliated against for filing EEOC actions. The EEOC reached this conclusion by comparing Bennun's qualifications with those of

Dr. Somberg. The Court finds that this proof is insufficient.

First, while the statements of Evangelidis evidence a certain hostility toward Bennun, there is no evidence indicating that such hostility related to Bennun's litigious past and more importantly, manifested itself in adverse employment action. Significantly, Evangelidis played no role in the various promotion decisions attacked by Bennun. Her statement simply cannot be imputed to the entire University to infer retaliatory animus.

Finally, the EEOC probable cause finding, while relevant to Bennun's claim of discriminatory treatment, does not identify any facts which would justify an inference of retaliation. Plaintiff presented no testimony concerning the timing of the various adverse employment actions such that the Court could an infer a retaliatory animus. *See Grant v. Bethlehem Steel Corp.*, 622 F.2d 43, 46 (2d Cir.1980); *Womack v. Munson*, 619 F.2d 1292, 1296 (8th Cir.1980), *cert. denied*, 450 U.S. 979, 101 S.Ct. 1513, 67 L.Ed.2d 814 (1981). Judgment is thus GRANTED for the defendant on plaintiff's retaliation claim.

■ The Court next addresses the issue of plaintiff's *prima facie* case of disparate treatment. Plaintiff is Hispanic and thus satisfies the first prong of the *prima facie* case.[5] In order to address the second and third prongs of the test it is necessary to examine Bennun's promotion packets and those of similarly situated individuals who were promoted.[6] The Court will focus particular attention on the promotion packet of Dr. Ethel Somberg who practiced in the same discipline as Dr. Bennun.

Promotion decisions at Rutgers, as stated, are made on the basis of five principal promotion criteria. They are teaching effectiveness, scholarly/creative activity, re-search accomplishments, professional activity and general usefulness. An individual promoted to full professor "should have met with distinction one or more of the criteria ... and have made substantial progress beyond that for which he or she was recognized at the associate professor level." The most heavily weighed criteria are research accomplishment, scholarly activity and teaching effectiveness. When reviewing a candidate the PRC relied heavily on the section and department to evaluate the candidate's research credentials.

University policy does not explicitly detail how peer review letters are to be considered. The testimony indicates that the weight attached to the letter depends on a variety of factors including the fame of the author and his/her department, the level of specificity in the letter and whether the evaluator was suggested by the candidate. Letters from individuals suggested by the candidate are labelled "A" letters while letters solicited by the department are labelled "B" letters. The evaluators, generally, consider the "B" letter more significant. This is not a hard and fast rule and would again depend on the level of specificity and author of the "B" letter in comparison to the specificity and fame of the author of the "A" letter.

Bennun was first considered for full professor in 1978–1979. The department voted 3–2–1 to promote. The college dean concurred. The A & P committee voted 0–4 not to promote. The section similarly voted 2–6–1 not to promote. The department rated Bennun outstanding in scholarly/creative activity and research accomplishments. He was rated average to below average in teaching effectiveness and general usefulness. He was rated above average in professional activity.

The A & P rated Bennun above average in scholarly creative activity and research

**5.** The court previously adjudicated this issue. *Bennun v. Rutgers*, Civ. Ac. No. 84–4655A (April 14, 1988) (Opinion and Order).

**6.** The University's reasoning with reference to qualification is circular. Rutgers asserts that "the University's evaluation procedure determines whether a candidate is qualified for promotion and tenure." They thus posit that be-cause Bennun was not promoted he was not qualified and therefore, by extension, can not meet the requirements of the *prima facie* case. If accepted this position would effectively shield Universities from scrutiny in that anyone denied promotion could never establish a prima facie case.

accomplishments. He was rated below average to average in teaching effectiveness and general usefulness. On Bennun's research, the committee commented that "Although he has made numerous contributions to conferences and symposia, Dr. Bennun has published his work in refereed, full length papers only at a modest rate." Concerning Bennun's professional activity, the committee noted that Bennun was "extraordinarily" active in his field and had brought "considerable" attention to the Newark College of Arts and Sciences. Concerning Bennun's scholarly activity, the committee opined that Bennun was "moderately active in his area of research and has produced results which have drawn favorable comment."

The Dean rated Bennun above average to outstanding in scholarly, research and professional activity. He rated him average to below average in teaching and general usefulness. The Dean noted that there "continues to be a question" about his research. He also noted that Bennun "is obviously intensely committed to research; he is very serious about his scholarly work and is deeply involved in scholarly activities of importance." The promotion review committed succinctly stated that it "finds insufficient evidence of distinction in teaching and scholarly work to warrant promotion at this time."

Bennun's *curriculum vitae* showed that he published 20 refereed articles appearing in significant scientific journals.[7] He published eight of these articles after he received tenure in 1972. Bennun also published, between 1969 and 1978, 21 abstracts and communications. Seventeen abstracts were published between 1972 and 1978. He gave 21 invited lectures between 1969–1978, thirteen between 1972 and 1978. He presented papers at 18 professional meetings between 1972–1978 and 22 between 1968 and 1978. His resume also reflects continued grant support and a wide variety of teaching responsibilities. For example, Bennun taught Seminars in Zoology,

Courses in experimental biochemistry, physiological zoology, general biology, metabolic pathways (control), metabolic pathways (mechanisms), Advanced Endocrinology, Research in Zoology, Special Topics in Biochemistry and Advanced Studies in Biochemistry.

Bennun's peer review letters are significant in that they came from internationally recognized leaders in the biochemistry field including Alfred Lehninger, Ephraim Racker, David Sabatini and a renowned French researcher "de la LLOSA."[8] Lehninger noted that while Bennun's work was not specifically in his field it "Looks to be interesting and novel" and supported by good experiments. He stated that Bennun's published output was "considerable and some of it quite interesting." He concluded that it was too early to determine whether the underlying theories "are valid" and recommended that the University contact Racker who had more expertise in Bennun's specific area of research.

Racker wholeheartedly supported Bennun for promotion. He wrote that "recent work on the effect of non-adrenaline on brain adenylate cyclase represents a significant contribution to this important field." Similarly, Sabatini, Chair of the Department of Cell Biology at NYU Medical Center, stated that Bennun was "well deserving promotion" based upon his "original scientific work...." Finally, de la LLOSA noted that Bennun's research work on adenylate cyclase was "remarkable."

Bennun was again considered for promotion in 1980–1981. His *curriculum vitae* showed in addition to the information on the 1978–1979 curriculum, a work being readied for publication, an additional published abstract, four additional invited lectures, an additional presentation to the American Society of Zoology, and additional grants. The department again recommended, 5–0–1, that he be promoted. They rated Bennun outstanding in research and scholarly activity, above average in profes-

---

7. Bennun's published in Nature New Biology, Biosystems, Mollecular and Cellular Biology and The Biochemical Journal.

8. Racker, Sabatini and "de La Llosa" were all "A" references suggested by the candidate. Lehninger was a "B" solicited by the University.

sional activity and average in teaching effectiveness. He was rated average to above average in general usefulness. The department wrote that "Bennun is obviously a biochemist of some stature who is concerned with applying his knowledge.... His research activity at Rutgers has been considerable and widely known. Much of it is in highly controversial areas where competitive and divergent theories exist. However, the supportive statements of three outside referees including two internationally famous members of the National Academy and a Past President of the American Society for Cell Biology cannot be ignored."

The A & P committee voted 4–0 not to promote rating Bennun average in all categories except professional activity which they rated him above average. The committee commented that it was "puzzled by the apparent lack of outside grant funding" for Dr. Bennun. The committee also noted that "Dr. Bennun's accomplishments are insufficiently acknowledged or evaluated by colleagues outside Rutgers to warrant promotion at this time." Concerning his research they "raised questions about: (1) the number of such publications since his coming to Rutgers; (2) The apparent lack of experimental follow-up to his theoretical papers; and (3) The *apparent unwillingness of outside evaluators* to commit themselves to detailed and informative judgment." (Emphasis added).

Stan Hall, the chair of the A & P committee, testified that the absence of current letters was a problem unique to Bennun's file which made it "impossible to make a valid appraisal because there were not sufficient letters." More importantly, Hall concluded that Bennun's Department was withholding a negative letter it had received in 1978–1979. He stated that "Obviously there must have been a damning letter there, so the department did not wish to submit one of those letters...."

The Dean recommended promotion praising Bennun's research particularly in light of the limited research space at the Newark campus. The Dean also noted that his work "has been very favorably evaluated in the past by *prominent* and *highly respected* biochemists." (Emphasis added). The section recommended against promotion 6–2–4 commenting that "additional evidence of a strong research program is needed. Even though the scholarship may be substantial in some of his publications, the total output is insufficient to support promotion to full Professor at this time." The PRC concurred in this assessment and recommended against promotion.

A similar pattern occurred in 1983–1984. The department recommended 5–0 to promote noting that Bennun was a "biochemist of some stature" with the continued support of three internationally famous outside referees. The department chair recommended against promotion without evaluating Bennun's scientific work. Rather, he took discernible umbrage at what he characterized as Bennun's attempts to bypass the chair when determining his teaching assignments. The A & P committee again recommended against promotion voting 1–2–1. The committee noted that it "does not feel that the candidate's performance at all levels warrants promotion." The Dean concurred stating that "The candidate is a research active scientist whose overall record is not sufficient to carry a recommendation for promotion to full professor."

The section voted 7–2 to promote. They commented that "Bennun is worthy of promotion on the basis of his research output and the training of graduate students.... His expertise has been recognized by his appointment to two editorial boards." It was also noted that Bennun spearheaded an effort to attract funding for minorities in the biochemical field on the Newark campus.

Bennun's 1983 file included five "B" letters and two "A's." Included in the "B's" were letters from Dr. Caesar Milstein an "eminent British biochemist" and Dr. Andre T. Jagendorf, an "outstanding biochemist." Among the "A's" was a new letter from the famous Racker. Although Racker was still supportive he negatively commented on Bennun's productivity. He wrote "I am endorsing the promotion of

Dr. Alfred Bennun although I must confess that I am very disappointed by his productivity. I don't believe he is fully using his natural talents." [9] Milstein wrote favorably of Bennun stating that he "certainly deserves support...." Eliot M. Ross, from the University of Texas, recommended against promotion. Jagendorf wrote that he could not comment because Bennun's work was outside his field. Gunter Zweig from the University of California judged Bennun "most eligible" for promotion. Similarly, Dr. Martin Blank from Columbia "strongly" supported Bennun's promotion. He wrote that Bennun's ideas were innovative and that he had achieved senior status in his discipline.

It is clear from this discussion that plaintiff has satisfied the burden of establishing that he was qualified for promotion. While the Court notes the caveat that "the oft times difficult decision to promote or to grant tenure shall be left exclusively to this nations colleges...." *E.E.O.C.*, 775 F.2d at 117, it is also equally true that "academic institutions and decisions are not *ipso facto* entitled to special treatment under federal laws prohibiting discrimination." *Kunda*, 621 F.2d at 545. The objective data on Bennun's *curriculum vitae* and the opinions of internationally renowned biochemists clearly demonstrate that Bennun was at the very least qualified for promotion to full professor. The more difficult issue concerns whether Bennun has satisfied the third prong of the prima facie case by demonstrating that other individuals, not in the protected class, were treated more favorably. To resolve this issue it is necessary to further examine Bennun's record with that of Dr. Somberg and, more importantly, the standards that were used to analyze Dr. Somberg's qualifications.

Ethel Somberg was associate professor of biochemistry in the Zoology and Physiology Department. She was considered and promoted to full professor in 1979. The department voted 5–0 to promote. The dean concurred. The A & P committee voted 4–0 to promote. The section voted 6–2–1 to promote. The department rated Somberg outstanding in teaching, scholarly activity and general usefulness. She was rated above average in research and professional activity. The Department noted that "considering her teaching responsibilities" she had a "commendable level of research activity."

The A & P committee rated Somberg outstanding in teaching, scholarly/creative activity and general usefulness. She was rated above average in professional activity and above average to average in research accomplishments. The committee noted that "Dr. Somberg's scholarly work both in terms of the extent of present and continuing activities and of the quality evident in the published work appears excellent." Concerning research the committee noted that "comments of the letters of recommendation and the evaluation of her colleagues suggest that Dr. Somberg's research accomplishments are above average in quantity and of very high quality."

The Dean rated Somberg outstanding in general usefulness, above average to outstanding in teaching, above average in scholarly, average to above average in research and average in professional activity. The Dean wrote that the "quality and continuity of the work is substantial in light of her many teaching and advising duties." Concerning research the dean wrote "While a few of the letters of evaluation are rather old, and the new letters speak of her overall role, it is nonetheless clear that she does work of quality and it is important to note that the output has increased of late."

The section noted "recent publications as evidence of continuing research activity and therefore recommends promotion to full prof." Somberg's *vitae* listed 17 total publications, including abstracts, between 1965 and 1978, thirteen between 1969 and 1978. Of these articles six were in refereed journals, three of which were published since her last promotion. It also referenced works in progress which had not been published or accepted for publica-

**9.** The court notes that while Racker comments negatively, this letter is also a significant endorsement of Bennun's talents particularly considering the fame and renown of the author.

tion. It showed service on one editorial board, no invited presentations at symposia or seminars and one grant. The *curriculum vitae* did not specifically reference her teaching responsibilities. Form 2a, however, used by the department to rate Somberg, indicates that she taught elementary biochemistry, general biochemistry, molecular and cellular biology and nucleic acids. Somberg's promotion packet included only five letters, three A's and two B's. There were no positive letters, either A's or B's, from a well known scientist or researcher. Two of the A letters were from previous colleagues.[10]

This analysis clearly establishes that Bennun has satisfied the third prong of the *prima facie* case. Objectively, the University applied a different standard to Dr. Somberg than it did to Bennun. In 1978 the A & P committee unanimously recommended that Somberg be promoted. The committee found Somberg's published work, "both in terms of extent" and "quality" excellent. The committee similarly found Somberg's research "above average in *quantity* and of very high quality." Somberg's promotion packet, however, revealed only three publications in refereed journals, no grants, no invited presentations and four works in progress. Somberg was also not a member of the prestigious Federation of American Society of Experimental Biologists as was Bennun. Bennun's 1981 packet revealed 13 articles in refereed journals between 1969 and 1981, 22 published abstracts, 22 presentations, service on two editorial boards and grants from the public and private sector. Concerning this record the same A & P committee wrote that Bennun has published "only at a modest rate" and was only "moderately active in his area of research...." [11] The Court does not quarrel with the University's proposition that when evaluating a candidate quality as well as quantity should be considered. However,

the evaluators themselves focused on quantity when considering both Somberg and Bennun. Bennun, whose quantity was clearly superior to Somberg was rated "moderate" while Somberg was considered "excellent." There was, therefore, shifting criteria applied concerning a candidate's rate of publication.

The University argued that this disparity could be explained because Somberg had shown an increase in productivity on the "eve of a promotion evaluation." Plaintiff accurately notes that this was an erroneous and more favorable standard. University guidelines required that the various promotion committee's consider the candidates productivity since the last promotion. Again, Somberg was treated more favorably than Bennun. The disparate standard applied to Bennun is also evidenced in the trial testimony of Dr. Young who served as provost during Bennun's 1980–81 evaluation and directly participated in the PRC's review of Bennun's file.

Young testified that to be promoted to full professor the University "expects that sort of ... would have become an influential investigator on the national and international scene." Nevertheless, with reference to Somberg, Young stated that she had an "impressive number of publications" and was "very intellectually alive and very up with her field." There was no indication that she had an impact on the discipline or was an "influential investigator on the national or international scene." Young's testimony is, therefore, simply incredible. Dr. Pond, general deputy to the president and chief operating officer of the University, similarly testified that to be promoted to full professor the candidate should be "maturing as a scholar" and his/her work should have "impact ... on the discipline at large and level of recognition." Again, Somberg's record is deficient when measured against this standard. The

**10.** A number of Bennun's positive letters were also from individuals suggested by Bennun. The significant difference is that these letters came from internationally famous scientists.

**11.** Dr. Jordan, Chair of the Department of Chemistry and member of the A & P committee

in 1981–1982 testified that the committees negative recommendation was "based on the reading of the committee as to where the publications appeared, whether they were refereed journals or unrefereed journals. Third, the lack of external funding which was lacking."

disparate standard applied to Bennun is also evidenced by Young's testimony concerning grant support. He stated relative to Somberg's lack of grant support that "I don't know that she did or she didn't. It was not relevant to the judgment we were making on Ethel Somberg." In 1981 the A & P committee noted that it was puzzled by Bennun's lack of funding. Although Bennun had many more grants than Somberg, no similar comment was made with reference to her file.

Similarly, Bennun, who had continued support of internationally famous scientists, was found inadequate because the biochemistry community allegedly showed little interest in or willingness to comment on his work.[12] There was no similar requirement placed on Dr. Somberg who did not have the support of any internationally recognized scientist. It is also important to note that when the dean evaluated Somberg he noticed that many of her letters were old. He did not infer from this fact that there was a lack of interest in her work or, more importantly, that a damning letter was being withheld. When evaluating Bennun's packet the A & P committee inferred both conclusions although that packet, as stated, was objectively stronger than Somberg's in that it contained more letters from significant scholars in the Biochemistry field.

The disparate standard is also evidenced in the deans evaluation of Somberg's research. He wrote that Somberg's scholarly and creative activity was substantial in "light" of her many teaching responsibilities. Rutgers posited that "the question with which her evaluators were presented concerning her research accomplishments was whether her record in that area was so inadequate as to preclude promotion." With reference to Bennun, the University postulated that "the question presented to Bennun's evaluators was, given plaintiff's mediocre achievements across all the other criteria, whether his research accomplishments rose to a level of sufficient distinction to overcome his unimpressive performance across the other criteria."

There are three significant problems with this formulation. First, it completely contradicts the University promotion policy which states that an individual "should have met with distinction *one* or more of the criteria...." [13] Second, the University evaluators *did not* recommend against promotion because of Bennun's alleged "mediocre" teaching. Rather, the record clearly reflects that Bennun was denied promotion because of perceived inadequacies in his research program. The record also reflects that various evaluations of Bennun's teaching were very similar to evaluations of Somberg's.[14] Finally, and perhaps most

---

**12.** Stan Hall testified as follows: Q: You concluded that peers in his field did not think enough of Dr. Bennun to take a half-hour to write a letter for him. Is that correct? A: That's Correct.

**13.** As stated the most heavily weighted criteria were research, scholarly activity and teaching effectiveness. It should also be noted that the University promotion policy provides that an individual should be judged in his chosen area of expertise: "It is important that once it has been decided what a particular individual's area of responsibility is to be, he or she be judged with respect to the duties assigned. Thus persons who are primarily teachers should be judged as teachers; persons who are primarily research scholars would be judged as research scholars...." The University's formulation subjects Dr. Bennun to a disparate standard in that it required him to excel in all five promotion criteria.

**14.** For example, in 1979 James Hall, Professor of Physiology, in a peer review wrote that "The

oral presentation was clear and understandable.... At several points he checked with the class to find out if they understood a particularly involved concept, and in a couple of cases went over it again.... It was clear that Dr. Bennun was in command of the subject and found the topic interesting, even exciting, but he was not too successful in projecting this enthusiasm to his audience. However, the presentation was well organized, clear and factual. The class was attentive and responsive."

In 1978 Dr. Hall wrote of Somberg that "lectures are clear, well organized, logically developed.... Students interested, attentive and inquisitive. Care is taken to ensure that difficult concepts are understood. Student questions are answered thoroughly and student participation is encouraged." The court does not readily discern the significant differences between these assessments. In fact, objective analysis supports the proposition that there are no real differences.

importantly, the objective record simply does not support the University's contention that Bennun was mediocre in all areas besides research.

For example, Dr. Young testified that Somberg taught a broader array of courses than Bennun. Her *curriculum vitae* shows that while in the department she taught seven different courses from Elementary Biochemistry to General Biochemistry. Bennun taught twelve courses from Advanced Endocrinology to General Physiology. Bennun's record of professional activity also exceeded Somberg's. In fact, the A & P committee recognized in 1978 that he was "extraordinarily active professionally ... and has thereby brought considerable attention to the Newark College of Arts and Sciences." The record, therefore, clearly demonstrates that a shifting disparate standard was applied to evaluate the qualifications of Drs. Bennun and Somberg. The burden of production then shifted to Rutgers to articulate a legitimate nondiscriminatory reason for its action.

 Defendant relied on the reasons articulated in Bennun's promotion packets and on the testimony of individuals who participated on the reviews. In the judgment of the A & P committee in 1981, Bennun's "accomplishments are insufficiently acknowledged or evaluated by colleagues outside Rutgers to warrant promotion at this time." The section stated: Additional evidence of a *strong research* program is needed. Even though the scholarship may be substantial in some of his publications, the total output is insufficient to support promotion to full professor at this time." The PRC similarly focused on Bennun's research. They wrote, "The record indicates that he has not established a scholarly and research production to reach the level required for the rank of Professor."

In 1982 the A & P again wrote that "The work which Dr. Bennun has produced is not quantitatively or qualitatively at the level which we expect for a full Professor at a major university." The PRC considered Bennun's letters badly mixed and, in its recommendation to the President,

wrote "the record does not document the research accomplishments necessary to warrant this promotion."

In 1984 the A & P committee again wrote that "... there was insufficient evidence of distinction, specially in research accomplishments, to merit promotion to full professor." The Dean concurred, writing: (1) The candidate pursues a reasonably active program of research that is not characterized by great originality or much impact on the profession; (2) The overall quantity and quality of the candidates record of publication is rather less than might be expected in PhD granting department; and (3) The overall record of Dr. Bennun is not sufficient to carry a recommendation for promotion."

The PRC wrote, in part, that "The assessments by the candidates internal and external peers of his accomplishments in research since he was awarded tenure do not sufficiently reflect the recognition for original contributions to the discipline and leadership in its development which is necessary to justify this promotion." The University therefore proffered a legitimate non-discriminatory reason for denying Bennun promotion: his research was considered uncreative, moderate in quantity and insufficiently recognized in his field. Plaintiff thereafter had to establish by a preponderance of the evidence that this proffered reason was pretextual.

 Pretext may be demonstrated either directly "or indirectly by showing that the employer's proffered explanation is unworthy of credence." *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095 (*citing McDonnell Douglas*, 411 U.S. at 804–805, 93 S.Ct. at 1825–1826). Plaintiff's proof again focused on comparative analysis, similar to that used to establish his *prima facie* case, to demonstrate that Rutgers' proffered reason is not worthy of credence. Although the University strongly urged throughout the litigation that plaintiff's comparative analysis was flawed, particularly because it focused almost exclusively on research accomplishments, plaintiff focused on this area not because the other areas were insignificant, but rather, because defendant's

proffered reason for denying promotion was Bennun's research. The Court's analysis must also focus on this area to determine if it is worthy of credence or was a pretext used to mask an impermissible discriminatory criteria.

When evaluating a candidate's research the university focuses on peer review letters, productivity as measured by publications, research support, service on editorial boards and invitations to conferences. The Court will first focus on the peer review letters of Dr. Bennun and Dr. Somberg.

Dr. Young testified that Bennun's letters did not explain the extent to which his work impacted his discipline. A brief review of these letters belies this claim. As previously indicated Bennun's letters, to a great majority, came from individuals at the "top of their field." A number of these letters directly reference Bennun's impact on his field. For instance, Lehninger's letter references both Bennun's work in energy transduction and adenylate cyclase. Garlid also specifically comments on Bennun's work on modulators of adenylate cyclase. Racker wrote that Bennun's work in this area "represents a significant contribution to this important field." Sabatini's letter was likewise specific in its praise. He wrote "I am particularly impressed by his discovery of interesting in vitro effects of ions and hormones on the enzyme activity, which probably will shed light on the mechanism of feedback regulation." Finally, P. de la LLOSA simply said that Bennun's work on adenylate cyclase was "remarkable."

As stated, Dr. Somberg's letters did not come from renowned scientists. More importantly for this inquiry, they do not in any way indicate how her work impacted her field. Shapiro, a former student, writes that her papers "will be a most useful source of information for current and future investigators." Mehlman, another friend, does not comment on Somberg's research at all. Rather, the letter focuses on her teaching and contributions to the school at large. Harris, an associate of Somberg's for seventeen years, is more specific but no more so than Bennun's re-

viewers. Simmons, from Upsala College, offers no substantive comment concerning the impact of Somberg's work on her field. This analysis reveals, beyond any doubt, that the articulated reason for Bennun's rejection is merely a play on words without any basis in fact.

Review of the peer review letters of other individuals promoted during the same period reveals similar inconsistencies in the University's evaluation of Bennun. Robert Herman, a professor in the zoology section, was considered and promoted to full professor in 1981. Herman's packet is relevant to this analysis because the packet contained no "B" letters. The three reviewers were all "A's" suggested by the candidate. This deficiency did not affect his candidacy.

Similarly, Ronald Rockmore, a physicist, was promoted to full professor in 1979 despite peer review letters which clearly did not indicate that Rockmore was an influential investigator or had contributed significantly to his field. Kerman, from MIT, wrote that he "was not a leading light in his field." Similarly, Greenberg wrote that he did not recognize that his articles had made a "significant contribution to this field." Rosner and Weinberg both declined to offer substantive comment. Amado indicated that Rockmore's work was first class but not up to international standards. ("It is true that he has chose to devote a good deal of his effort to particle theory and that the international standards there are very high. If you insist upon measuring him against Gell–Mann you will find him not quite up to it!")

The Court does not conclude or infer that any of these individuals did not deserve to be promoted. Rather, they are used merely to illustrate that the reasons articulated by the University concerning Bennun are simply not believable. Plaintiff has, therefore, demonstrated by a preponderance of the evidence that the University's proffered, non-discriminatory reason was not worthy of credence. In summary, plaintiff has satisfied the requirements of a *prima facie* case and demonstrated pretext by the following:

1. A different standard was applied to Bennun in terms of number of publications. (Bennun with more publications was moderately active while Somberg was excellent in quantity.)

2. A different standard was applied to Bennun concerning what level of achievement was necessary to be promoted. (Bennun was required to become an international leader while other promoted candidates, whose letters indicated they were not international leaders, were promoted.)

3. A different standard was applied concerning grant support. (For Bennun this was a negative factor, for Somberg it was not relevant)

4. A different standard was applied concerning the level of specificity required by peer reviewers. (Bennun's were not specific while other promoted candidates had none.)

5. A different standard was applied concerning the age of the peer review letters. (Bennun's were old and therefore negative. Somberg's, although just as old were not considered dispositive.)

6. A different standard was applied concerning the number of peer review letters. (The University inferred a lack of interest in Bennun but not in others who did not have the continued support evidenced in Bennun's packet.)

7. The A & P committee *sua sponte* concluded, without any evidence, that a damning letter was being withheld from Bennun's packet. No such inference was drawn with reference to other candidates with similar or less substantial peer review packets.

8. Somberg's research was considered in light of her teaching. Bennun who taught a similar load was not so evaluated.

9. The University's explanation that Bennun's research was inadequate is not worthy of credence in light of a comparative analysis with other promoted candidates whose research qualifications were judged excellent.

The Court recognizes that it should not act as a super promotion committee and that the University will surely contend that it did just that. The Court also recognizes that academic decisions, subjective and based on arcane areas of science beyond the immediate expertise of the Court, should be left to the individuals best suited by position and education to make such assessments. But, it is equally true that civil rights laws apply to Universities. Academic freedom does not translate into freedom to act beyond the scrutiny of the law. This Court has no hesitancy in applying those laws, within the framework established by the Supreme Court, to academic institutions. In this case, the record dramatically demonstrates that a shifting standard was applied to the plaintiff. There is no smoking gun, there is no racist statement of Hispanic bias. Nevertheless, close scrutiny of defendant's proffered reasons for rejecting Bennun is compelling. This Court finds discrimination.

There may well have been some other reason for the University's action distinct from a racial animus. That reason was not articulated. The one that was does not withstand scrutiny. Something was wrong in Denmark. This Court must right that wrong. To remain free from such scrutiny or "interference" Universities need only follow the simple caveat that standards governing subjective determinations should be applied evenly. The law requires only that much. If done so a Court could not "second guess" the University. Judgment is thus entered for plaintiff on his disparate treatment claim.

 On the issue of damages the Court finds that Bennun did not credibly establish emotional or mental harm. No compensatory or other relief available under § 1981 is, therefore, awarded. Plaintiff has proved his Title VII case and equity mandates that he be retroactively promoted to full professor with full back pay from the 1980–1981 review. *See Sprogis v. United Air Lines*, 444 F.2d 1194 (7th Cir. 1971), *cert. denied*, 404 U.S. 991, 92 S.Ct. 536, 30 L.Ed.2d 543 (1971). The Court does not consider that this remedy would cause increased tension or animosity between Bennun and the University. Bennun is already tenured and has consistently demon-

**1410**

strated his tenacity and ability to overcome tension filled work environments. As such, there are no countervailing considerations weighing against retroactive promotion. In fact, retroactive promotion is the only viable remedy available to place defendant in the position he would have been absent discrimination. Defendant is further enjoined from engaging in any and all discriminatory or retaliatory actions against plaintiff.

SO ORDERED: